**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
————————————————————————

**DONNA SEAMAN,**

                              **Plaintiff,**          **08 Civ. 3618 (JGK)**

            **- against -**                  **MEMORANDUM OPINION AND**
                                             **ORDER**

**MEMORIAL SLOAN KETTERING CANCER**
**CENTER, ET AL.,**

                              **Defendants.**
————————————————————————

**JOHN G. KOELTL, District Judge:**

Donna Seaman ("Seaman") was hit on the head by a falling
file cabinet in her father's garage in April 1998.  In June
2001, Seaman began working as a radiation therapist at Memorial
Sloan Kettering Cancer Center ("MSKCC"), a sensitive position in
which she was responsible for some life and death activities.
Seaman stopped work in February 2002 due to pain, memory
impairment, disorientation, and numbness in her hands.  First
Unum Life Insurance Company ("First Unum"), MSKCC's long-term
disability carrier, approved Seaman's claim for long-term
disability benefits for a period beginning on August 8, 2002.
First Unum continued to pay Seaman disability benefits for 24
months.  In a letter dated August 18, 2004, relying in part on
the determination of its own doctors, First Unum notified Seaman
that her claim was being terminated.  First Unum relied on the
policy's mental illness, alcoholism, and drug abuse limitation,
which limits benefits to 24 months, because First Unum concluded

that Seaman's disability is due to a mental illness.  Seaman, on the other hand, contended that her disability was caused by physical injury resulting from her 1998 accident.  First Unum subsequently denied Seaman's administrative appeal on similar grounds.  Seaman filed the current lawsuit in this Court claiming that First Unum violated her rights under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, et seq..  In particular, the plaintiff claims that she was denied benefits to which she was entitled under a plan covered by ERISA, in violation of 29 U.S.C. § 1132(a)(1)(B).[1]  The parties have now filed cross motions for summary judgment on the administrative record pursuant to Federal Rule of Civil Procedure 56.

## I.

The following facts are undisputed except where otherwise noted.

---

[1] Pursuant to a stipulation signed by this Court on April 16, 2009, MSKCC and MSKCC Basic and Voluntary Retirement Plan were dismissed as defendants in this case.

**A.**

Seaman moved to Great Britain in 1997 and thereafter traveled back and forth between Great Britain and the United States.  (First Unum's Local Civil Rule 56.1 Statement ("Def.'s 56.1 Stmt.") ¶¶ 7-10, May 8, 2009; Seaman's Response to Rule 56.1 Statement ("Pl.'s 56.1 Stmt.") ¶¶ 7-10, July 16, 2009.)  On April 17, 1998, Seaman alleges that she lost consciousness after a cabinet in her parents' garage fell on her head, although First Unum denies that the record contains a consistent account of the accident.  (Seaman's Rule 56.1 Statement ("Pl.'s 56.1 Stmt.") ¶ 1, May 8, 2009; First Unum's Local Civil Rule 56.1(b) Counter-Statement ("Def.'s 56.1 Stmt.") ¶ 1, July 16, 2009.)  Seaman was taken to the hospital, where her CT scan was negative.  (Pl.'s 56.1 Stmt. ¶ 1, May 8, 2009; Def.'s 56.1 Stmt. ¶ 1, July 16, 2009; R. at 703.)  There is no indication that Seaman stayed in the hospital for more than one night and the record contains no records of the hospitalization.  (Seaman Decl. ¶ 2-11, Aug. 17, 2009.)  Seaman alleges that she submitted the records to the Social Security Administration in support of her claim for disability.  (Seaman Decl. ¶ 11, Aug. 17, 2009.)

In a letter dated April 21, 1998, Dr. Martin, who initially evaluated Seaman, noted that she suffered from a cerebral

concussion, headaches, nausea, numbness, and other symptoms
resulting from the accident, although a CT scan taken at the
hospital after the accident was "apparently negative". (Pl.'s
56.1 Stmt. ¶¶ 2-3, May 8, 2009; Def.'s 56.1 Stmt. ¶¶ 2-3, July
16, 2009; Def.'s 56.1 Stmt. ¶ 67, May 8, 2009; Pl.'s 56.1 Stmt.
¶ 67, July 16, 2009; R. at 973-75.)  Dr. Martin also noted that
Seaman was in good health prior to the injury, and did not
recall any prior head or neck injuries. (Pl.'s 56.1 Stmt. ¶ 4,
May 8, 2009; Def.'s 56.1 Stmt. ¶ 4, July 16, 2009; R. at 974.)
In a series of follow-up visits from April to September 1998,
Dr. Martin reported that Seaman continued to suffer from "visual
difficulty", nausea, memory difficulty, and significant itching
of the left forehead. (Pl.'s 56.1 Stmt. ¶¶ 5-7, May 8, 2009;
Def.'s 56.1 Stmt. ¶¶ 5-7, July 16, 2009; R. at 976-77.)  In
April 1999, Seaman continued to complain of headaches and facial
pain to Dr. Martin. (Pl.'s 56.1 Stmt. ¶ 8, May 8, 2009; Def.'s
56.1 Stmt. ¶ 8, July 16, 2009; R. at 978.)  In November 1999,
Seaman reported to Dr. Martin that she continued to experience
facial pain, although her cognitive and memory functions
returned to near normal. (Pl.'s 56.1 Stmt. ¶ 8, May 8, 2009;
Def.'s 56.1 Stmt. ¶ 8, July 16, 2009; Def.'s 56.1 Stmt. ¶ 67,
May 8, 2009; Pl.'s 56.1 Stmt. ¶ 67, July 16, 2009; R. at 980.)
She also indicated to Dr. Martin that she had undergone plastic
surgery to lift her eyebrows, and worried that the procedure may

have contributed to her facial and scalp pain.  (Pl.'s 56.1
Stmt. ¶ 8, May 8, 2009; Def.'s 56.1 Stmt. ¶ 8, July 16, 2009; R.
at 980.)

Since the accident, Seaman has been seen by numerous
doctors who have noted various symptoms and disabilities.  On
January 20, 2002, after Seaman had begun working at MSKCC as a
radiation therapist, psychologist Dr. Markewich initiated
efforts to obtain neuropsychological testing for Seaman to
determine whether she had any brain damage that does not show up
on MRI or CAT scans.  (Pl.'s 56.1 Stmt. ¶ 11, May 8, 2009;
Def.'s 56.1 Stmt. ¶ 11, July 16, 2009; Def.'s 56.1 Stmt. ¶ 27,
May 8, 2009; Pl.'s 56.1 Stmt. ¶ 27, July 16, 2009; R. at 32.)
While the parties disagree about Dr. Markewich's assessment, he
recounted his visits with Seaman during January 2002 in his
January 24, 2002 report.  He noted that Seaman had "no memory of
her head injury," that her MRI and CT scans were "normal," and
that Seaman has trouble sleeping, worries, "was depressed,"
obsessive at work, and cleaned compulsively.  (Def.'s 56.1 Stmt.
¶¶ 17-19, May 8, 2009; Pl.'s 56.1 Stmt. ¶¶ 17-19, July 16, 2009;
R. at 32, 408.)  Dr. Markewich reported that Seaman suffered
from "major depression," "panic disorder with agoraphobia,"
"personality change due to medical condition," and "obsessive
compulsive disorder."  (Def.'s 56.1 Stmt. ¶ 26, May 8, 2009;
Pl.'s 56.1 Stmt. ¶ 26, July 16, 2009; R. at 24.)

On July 3, 2002, Seaman, by this time pregnant, was examined by neurologist Dr. Kirkpatrick in the United Kingdom, where she had relocated.  (Pl.'s 56.1 Stmt. ¶ 13, May 8, 2009; Def.'s 56.1 Stmt. ¶ 13, July 16, 2009; R. at 498-503.)  Dr. Prince, who referred Seaman to Dr. Kirkpatrick, indicated in his referral that Seaman's "CT scans have not revealed any abnormality."  (Def.'s 56.1 Stmt. ¶ 36, May 8, 2009; Pl.'s 56.1 Stmt. ¶ 36, July 16, 2009; R. at 447.)  Dr. Kirkpatrick opined that while a skull x-ray taken shortly after Seaman's 1998 accident "showed no injuries," Seaman's current symptoms were "likely to be permanent" and indicated that Seaman "has clearly suffered a significant head injury with a post-concussional syndrome.  Cardinal features include headaches, dizziness, poor concentration and memory, reduced left/right discrimination, and poor coordination, panic attacks, and difficulties with social interactions are also common."  (Pl.'s 56.1 Stmt. ¶ 13, May 8, 2009; Def.'s 56.1 Stmt. ¶ 13, July 16, 2009; R. at 500, 502.)

On January 17, 2003 Dr. Leidal, a clinical psychologist and neuropsychologist retained by the Social Security Administration, noted that Seaman has above average intelligence, but suffers from poor memory, "cerebral dysfunction," and "neuropsychological dysfunction."  (Pl.'s 56.1 Stmt. ¶¶ 15-17, May 8, 2009; Def.'s 56.1 Stmt. ¶¶ 15-17, July

16, 2009; Def.'s 56.1 Stmt. ¶ 42, May 8, 2009; Pl.'s 56.1 Stmt. ¶ 42, July 16, 2009; R. at 482-85.)

Seaman was tested by Dr. Politzer, an optometrist, on February 6, 2003 and March 10, 2003.  Dr. Politzer noted that Seaman's "visual perceptual abilities are below expected in visualization as well as in speed and span of perception" and that her "[v]isual field shows some scattered losses."  (Pl.'s 56.1 Stmt. ¶ 18, May 8, 2009; Def.'s 56.1 Stmt. ¶ 18, July 16, 2009; R. at 965.)

In May 2003, after 2 days of neuropsychological testing, clinical psychologist Dr. Wack noted Seaman's "very, very slowed rate of cognitive processing," "significant impairments in visual perception and processing visual information," and that Seaman "lacks the functional memory capacity that her intellectual ability should allow for."  (Pl.'s 56.1 Stmt. ¶¶ 19-22, May 8, 2009; Def.'s 56.1 Stmt. ¶¶ 19-22, July 16, 2009; R. at 696-701.)

In a letter dated March 3, 2004, Dr. Lennox, a neurologist in the United Kingdom reported that he had reviewed MRI scans of Seaman taken on November 13, 1999 and October 15, 2003.  Dr. Lennox stated that "[b]oth scans show probable mild atrophy of the posterior frontal and parietal lobes, consistent with [Seaman's] symptoms.  This has not progressed between 1999 and 2003, consistent with a traumatic causation."  (Pl.'s 56.1 Stmt.

¶¶ 25-27, May 8, 2009; Def.'s 56.1 Stmt. ¶¶ 25-27, July 16, 2009; R. at 800-01.)  The record does not contain these MRI scans, and the plaintiff has not provided them to First Unum or its reviewing doctors.  (Seaman Decl. ¶ 12, Aug. 17, 2009.)

B.

On June 18, 2001, Seaman began working as a radiation therapist with MSKCC.  (Pl.'s 56.1 Stmt. ¶ 9, May 8, 2009; Def.'s 56.1 Stmt. ¶ 9, July 16, 2009; Def.'s 56.1 Stmt. ¶ 11, May 8, 2009; Pl.'s 56.1 Stmt. ¶ 11, July 16, 2009.)  According to the plaintiff and her attorney, Seaman's position at MSKCC is "critical work" posing "life-threatening consequences should a mistake occur."  (R. at 941.)  On July 1, 2001, Seaman was enrolled in MSKCC's long-term disability plan, underwritten by First Unum.  (Pl.'s 56.1 Stmt. ¶ 9, May 8, 2009; Def.'s 56.1 Stmt. ¶ 9, July 16, 2009; Def.'s 56.1 Stmt. ¶ 2, May 8, 2009; Pl.'s 56.1 Stmt. ¶ 2, July 16, 2009.)  It is undisputed that the policy grants First Unum discretionary authority to make claim determinations under the plan and to construe the terms of the policy.  (Def.'s 56.1 Stmt. ¶ 3, May 8, 2009; Pl.'s 56.1 Stmt. ¶ 3, July 16, 2009.)  The policy requires a claimant to prove a disability to First Unum, and limits benefits for mental illness to 24 months.  (Def.'s 56.1 Stmt. ¶¶ 4, 6, May 8, 2009; Pl.'s

56.1 Stmt. ¶¶ 4, 6, July 16, 2009; R. at 56, 61.)  Disability
under the policy is defined, in pertinent part, as an inability
to perform, due to sickness or injury, "the material duties of
[the claimant's] regular occupation." (Def.'s 56.1 Stmt. ¶ 5,
May 8, 2009; Pl.'s 56.1 Stmt. ¶ 5, July 16, 2009; R. at 51.)
After 24 months of benefits have been paid, the policy
definition of disability requires that "the insured cannot
perform each of the material duties of any gainful occupation
for which [the insured] is reasonably fitted, taking into
consideration training, education or experience, as well as
prior earnings. . . ." (R. at 51.)  The policy's "mental
illness, alcoholism, and drug abuse limitation" states,
"Benefits for disability due to mental illness, alcoholism or
drug abuse will not exceed 24 months of monthly benefit payments
unless" the insured is hospitalized or confined. (Def.'s 56.1
Stmt. ¶ 6, May 8, 2009; Pl.'s 56.1 Stmt. ¶ 6, July 16, 2009; R.
at 61.)  The policy defines "mental illness" as "mental, nervous
or emotional diseases or disorders of any type." (R. at 61.)

Beginning February 8, 2002, Seaman claimed that she was
unable to work because of pain, memory impairment,
disorientation, and numbness in her hands, and she timely
submitted a claim to First Unum for long-term disability
benefits. (Pl.'s 56.1 Stmt. ¶ 12, May 8, 2009; Def.'s 56.1
Stmt. ¶¶ 12-14, July 16, 2009; Def.'s 56.1 Stmt. ¶¶ 12-14, May

8, 2009; Pl.'s 56.1 Stmt. ¶ 12, July 16, 2009; R. at 16.)  First
Unum consulted a nurse and neuropsychologist Dr. Wentland, and
obtained records.  (Def.'s 56.1 Stmt. ¶¶ 29-31, May 8, 2009;
Pl.'s 56.1 Stmt. ¶¶ 29-31, July 16, 2009.)  Dr. Wentland
reported that "[w]hile there is no evidence of any systemic
physical illness in the record, we cannot rule out physical
damage to brain" and noted that the record provided by the
claimant does not indicate that an MRI had been performed.
(Def.'s 56.1 Stmt. ¶¶ 45-46, May 8, 2009; Pl.'s 56.1 Stmt. ¶¶
45-46, July 16, 2009; R. at 1249.)

     In January 2003, First Unum began to pay Seaman benefits,
including a back-benefit check for benefits beginning on August
8, 2002, but reserved its rights.  (Pl.'s 56.1 Stmt. ¶ 14, May
8, 2009; Def.'s 56.1 Stmt. ¶ 14, July 16, 2009; Def.'s 56.1
Stmt. ¶¶ 32-34, May 8, 2009; Pl.'s 56.1 Stmt. ¶¶ 32-34, July 16,
2009; R. at 397-99.)  In this letter, First Unum indicated that
it had not yet determined whether the 24 month mental illness
limitation applied, that it would need more information before
it could make a final determination, and requested that Seaman
help obtain various medical records.  (Pl.'s 56.1 Stmt. ¶ 14,
May 8, 2009; Def.'s 56.1 Stmt. ¶ 14, July 16, 2009; Def.'s 56.1
Stmt. ¶¶ 32-34, May 8, 2009; Pl.'s 56.1 Stmt. ¶¶ 32-34, July 16,
2009; R. at 398-99.)

On July 30, 2003, First Unum obtained a review of Seaman's file conducted by Dr. Zimmerman, a clinical neuropsychologist and licensed psychologist.  (Pl.'s 56.1 Stmt. ¶ 23, May 8, 2009; Def.'s 56.1 Stmt. ¶ 23, July 16, 2009; Def.'s 56.1 Stmt. ¶ 48, May 8, 2009; Pl.'s 56.1 Stmt. ¶ 48, July 16, 2009; R. at 721-25.)  Dr. Zimmerman did not herself examine Seaman, but reviewed the reports and notes from Drs. Leidal, Wack, and Markewich. (Pl.'s 56.1 Stmt. ¶ 24, May 8, 2009; Def.'s 56.1 Stmt. ¶ 24, July 16, 2009; R. at 721.)  Dr. Zimmerman concluded that "[t]here are identified inconsistencies in the testing that suggest the involvement of nonneurological factors such as effort and psychological factors and make it impossible to determine the claimant's level of cognitive functioning," that "[t]here is substantial evidence of serious psychological disturbance that is impairing," and that "[t]his pattern of findings is not consistent with expectation with mild traumatic brain injury or any other neurological etiology."  (Pl.'s 56.1 Stmt. ¶ 24, May 8, 2009; Def.'s 56.1 Stmt. ¶ 24, July 16, 2009; Def.'s 56.1 Stmt. ¶ 49, May 8, 2009; Pl.'s 56.1 Stmt. ¶ 49, July 16, 2009; R. at 724.)

In a letter dated September 29, 2003 to Seaman's counsel, First Unum explained that it would be requesting medical information regarding whether Seaman's disability was mental or physical in nature.  (Def.'s 56.1 Stmt. ¶¶ 50-51, May 8, 2009;

Pl.'s 56.1 Stmt. ¶¶ 50-51, July 16, 2009; R. at 1261.)  In a
letter dated June 21, 2004, First Unum reiterated its request
that Seaman forward any neuropsychological evaluations and
warned her that her benefits would end August 7, 2004 unless
First Unum had received evidence of an impairing physical
condition.  (Def.'s 56.1 Stmt. ¶¶ 53-54, May 8, 2009; Pl.'s 56.1
Stmt. ¶¶ 53-54, July 16, 2009; R. at 847.)  On July 22, 2004
First Unum reminded Seaman that it had not yet received the
requested medical documentation.  (Def.'s 56.1 Stmt. ¶ 55, May
8, 2009; Pl.'s 56.1 Stmt. ¶ 55, July 16, 2009; R. at 853.)  On
August 4, 2004 Seaman's counsel responded that the requested
records were with the National Health Service in England, which
had been slow to provide them.  (Def.'s 56.1 Stmt. ¶ 56, May 8,
2009; Pl.'s 56.1 Stmt. ¶ 56, July 16, 2009; R. at 858.)
According to Seaman, the 1998 hospitalization records and MRI
films requested by First Unum are not in her control.  (Seaman
Decl. ¶¶ 11-12, Aug. 17, 2009.)  She explains that the hospital
records are with the Social Security Administration and the MRI
films are in England.  (Seaman Decl. ¶¶ 11-12, Aug. 17, 2009.)

     Eventually, First Unum determined that there was a mental
impairment but that there was no evidence of traumatic brain
injury and, therefore, the policy's two year limit for mental
illness applied.  (Pl.'s 56.1 Stmt. ¶¶ 28-29, May 8, 2009;
Def.'s 56.1 Stmt. ¶¶ 28-29, July 16, 2009; R. at 895-98.)  Prior

to termination, First Unum paid Seaman a total of $85,590.81 in benefits.  (Def.'s 56.1 Stmt. ¶ 57, May 8, 2009; Pl.'s 56.1 Stmt. ¶ 57, July 16, 2009.)  In a letter dated August 18, 2004, First Unum notified Seaman that her claim was being terminated. (Pl.'s 56.1 Stmt. ¶¶ 28-29, May 8, 2009; Def.'s 56.1 Stmt. ¶¶ 28-29, July 16, 2009; Def.'s 56.1 Stmt. ¶¶ 63-64, May 8, 2009; Pl.'s 56.1 Stmt. ¶¶ 63-64, July 16, 2009; R. at 895-98.)  First Unum relied in part on the report of Dr. Zimmerman who found mental illness, but who also concluded that Seaman's reports of mild traumatic bran injury or other neurological etiology were inconclusive.  (Pl.'s 56.1 Stmt. ¶ 24, May 8, 2009; Def.'s 56.1 Stmt. ¶ 24, July 16, 2009; R. at 724.)

Seaman appealed administratively in a letter dated February 17, 2005.  (Pl.'s 56.1 Stmt. ¶ 33, May 8, 2009; Def.'s 56.1 Stmt. ¶ 33, July 16, 2009; Def.'s 56.1 Stmt. ¶ 65, May 8, 2009; Pl.'s 56.1 Stmt. ¶ 65, July 16, 2009; R. at 940-44.)  In support of her appeal, Seaman provided a letter from Dr. Wack dated September 13, 2004 stating that the testing performed by Drs. Wack and Leidal in 2003 "show consistent evidence of impairments of the sort that are commonly associated with traumatic brain injury" and noted "the clear absence of psychological symptoms, and the equally clear presence of evidence of traumatic brain injury."  (Pl.'s 56.1 Stmt. ¶¶ 35-36, May 8, 2009; Def.'s 56.1 Stmt. ¶¶ 35-36, July 16, 2009; R. at 955-56.)  He also called

13

attention to the report of Dr. Lennox who found probable mild
atrophy of the brain which had not progressed from 1999 to 2003.
(R. at 955.)  In a letter dated January 31, 2005, Dr. Wack
argued that Seaman's depression and anxiety do not show that her
condition is psychiatric because "[s]uch reactions are a common
component of recovery from head injury and do not negate the
fact that a brain injury occurred" and it is not surprising that
Seaman would experience anxiety and depression when she lost her
ability to perform her job.  (Pl.'s 56.1 Stmt. ¶¶ 37-40, May 8,
2009; Def.'s 56.1 Stmt. ¶¶ 37-40, July 16, 2009; R. at 957-60.)

On the administrative appeal, First Unum turned to nurses
to review the records and Dr. Elizabeth Henrickson, a
neuropsychologist, who determined that the mental tests
submitted by the plaintiff were inconclusive and did not support
a brain injury, although she deferred to medical doctors.
(Def.'s 56.1 Stmt. ¶¶ 68-72, May 8, 2009; Pl.'s 56.1 Stmt. ¶¶
68-72, July 16, 2009; R. at 1095.)  She appears to have
disagreed with the conclusions of Dr. Wack and Dr. Leidel.
(Def.'s 56.1 Stmt. ¶¶ 68-72, May 8, 2009; Pl.'s 56.1 Stmt. ¶¶
68-72, July 16, 2009; R. at 1095.)

First Unum also relied on a medical doctor, Dr. Neuren, who
is board certified in psychiatry and neurology and is affiliated
with First Unum and who thoroughly reviewed all of the evidence
and concluded that there was no evidence of brain injury.

(Pl.'s 56.1 Stmt. ¶ 43, May 8, 2009; Def.'s 56.1 Stmt. ¶ 43, July 16, 2009; R. at 1105-13.)  Dr. Neuren noted that not all of Seaman's doctors noticed or documented the symptoms of her alleged head injury, and found "large numbers of inconsistencies" that "raise serious concerns about the extent of [Seaman's] problems and credibility."  (R. at 1105-10.)  Dr. Neuren relied on the reports of doctors who had seen the CT scan and MRI, and noted that while Seaman's CT scan after her 1998 accident was normal, "deficits from head injuries . . . are maximal the day after the event"—although Seaman disputes Dr. Neuren's interpretation of the studies he cites.  (Pl.'s 56.1 Stmt. ¶ 47, May 8, 2009; Def.'s 56.1 Stmt. ¶ 47, July 16, 2009; Def.'s 56.1 Stmt. ¶ 73, May 8, 2009; Pl.'s 56.1 Stmt. ¶ 73, July 16, 2009; R. at 1110-11.)  Dr. Neuren further questioned Seaman's credibility on the grounds that if she suffered from the injuries alleged, she would have been unable to obtain her position as a radiation therapist at MSKCC.  (Pl.'s 56.1 Stmt. ¶ 48, May 8, 2009; Def.'s 56.1 Stmt. ¶ 48, July 16, 2009; R. at 1110.)  He found unpersuasive the report of Dr. Lennox, Seaman's consulting doctor who opined that a comparison of the 1999 and 2003 MRIs showed mild atrophy consistent with traumatic brain injury.  (Pl.'s 56.1 Stmt. ¶ 49, May 8, 2009; Def.'s 56.1 Stmt. ¶ 49, July 16, 2009; Def.'s 56.1 Stmt. ¶ 74, May 8, 2009; Pl.'s 56.1 Stmt. ¶ 74, July 16, 2009; R. at 1110-11.)  He noted that

Dr. Lennox merely found "probable mild atrophy" which is both inconsistent with the normal findings of Drs. Martin and Kirkpatrick and "patently vague."    (Pl.'s 56.1 Stmt. ¶¶ 49-50, May 8, 2009; Def.'s 56.1 Stmt. ¶¶ 49-50, July 16, 2009; Def.'s 56.1 Stmt. ¶ 74, May 8, 2009; Pl.'s 56.1 Stmt. ¶ 74, July 16, 2009; R. at 1110-11.)   Further, Dr. Neuren questioned the credibility of Dr. Lennox's evaluation of the 1999 and 2003 MRIs because a finding that the MRIs did not change is inconsistent with Seaman's claim that her condition is worsening.  (Pl.'s 56.1 Stmt. ¶ 49, May 8, 2009; Def.'s 56.1 Stmt. ¶ 49, July 16, 2009; Def.'s 56.1 Stmt. ¶ 75, May 8, 2009; Pl.'s 56.1 Stmt. ¶ 75, July 16, 2009; R. at 1111.)   Dr. Neuren did not personally examine the MRI films because, although they were requested, they were not provided by Seaman.  (R. at 1112.)   First Unum denied Seaman's administrative appeal shortly after Dr. Neuren issued his report.  (Pl.'s 56.1 Stmt. ¶ 51, May 8, 2009; Def.'s 56.1 Stmt. ¶ 51, July 16, 2009; Def.'s 56.1 Stmt. ¶ 77, May 8, 2009; Pl.'s 56.1 Stmt. ¶ 77, July 16, 2009; R. at 1126-29.)

The Court of Appeals has noted that First Unum has a "well-documented history of abusive tactics," and that factor should be emphasized in the absence of any evidence that First Unum has changed its internal procedures.  See McCauley v. First Unum Life Ins. Co., 551 F.3d 126, 137 (2d Cir. 2008).  First Unum points out correctly that this does not foreclose upholding

First Unum's determination, and First Unum argues that far more
of its determinations have been upheld than have been reversed.
See, e.g., Flanagan v. First Unum Life Ins., 170 F. App'x 182,
184 (2d Cir. 2006) (affirming under arbitrary and capricious
review First Unum's denial of disability claim); Pulvers v.
First Unum Life Ins. Co., 210 F.3d 89, 96 (2d Cir. 2000) (First
Unum's denial of claim not arbitrary and capricious).
Nevertheless, under McCauley, the Court will take that issue
into account in reviewing First Unum's determination in this
case.

The plaintiff also contends that Dr. Neuren has been
criticized and the Court should take that into account.  See
White v. Unumprovident, No. 03 Civ. 5845, 2005 WL 1683735, at
*13-14 (D.N.J. July 18, 2005) (declining to grant summary
judgment when Dr. Neuren's report "clearly misinterpreted" the
report of another doctor and "ignores, without comment, contrary
conclusions expressed therein," indicating the possibility that
First Unum's decision-making process was biased against
claimant, but there remained a genuine issue of material fact as
to whether First Unum acted arbitrarily and capriciously in
denying claim); cf. Graham v. L & B Realty Advisors, Inc., No.
02 Civ. 293, 2003 WL 22388392, at *4 & n.6 (N.D. Tex. Sept. 30,
2003) (finding that although Dr. Neuren's relationship with
First Unum is "troubling," his opinion was based on objective

17

test data and declining to criticize Dr. Neuren himself).  First
Unum responds that this is unfair because courts have also
upheld determinations in which Dr. Neuren played a key role.
See, e.g., Dolfi v. Disability Reins. Mgmt. Servs., Inc., 584 F.
Supp. 2d 709, 735 (M.D. Pa. 2008) (not arbitrary and capricious
for plan administrator to credit Dr. Neuren's conclusions over
claimant's treating physicians when Dr. Neuren reviewed
claimant's entire medical record).  The Court has, of course,
carefully reviewed Dr. Neuren's report with the appropriate
scepticism warranted by the fact that First Unum has a conflict
of interest and Dr. Neuren is affiliated with First Unum.

## II.

### A.

     Both parties have moved for summary judgment.  Summary
judgment may not be granted unless "the pleadings, the discovery
and disclosure materials on file, and any affidavits show that
there is no genuine issue as to any material fact and that the
movant is entitled to judgment as a matter of law."  Fed. R.
Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317
(1986); Gannon v. Aetna Life Ins. Co., No. 05 Civ. 2160, 2007 WL
2844869, at *10 (S.D.N.Y. Sept. 28, 2007).  The moving party
bears the initial burden of "informing the district court of the

basis for its motion" and identifying the matter that "it
believes demonstrate[s] the absence of a genuine issue of
material fact."  Celotex, 477 U.S. at 323.  The substantive law
governing the case will identify those facts which are material
and "[o]nly disputes over facts that might affect the outcome of
the suit under the governing law will properly preclude the
entry of summary judgment."  Anderson v. Liberty Lobby, Inc.,
477 U.S. 242, 248 (1986); Gannon, 2007 WL 2844869, at *10.

    Where, as in this case, an ERISA plan provides an
administrator with discretion to determine benefits, the
administrator's determination of benefits should be upheld
unless it was arbitrary or capricious.  See Firestone Tire &
Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989); see also Celardo
v. GNY Auto. Dealers Health & Welfare Trust, 318 F.3d 142, 145
(2d Cir. 2003); Pagan v. NYNEX Pension Plan, 52 F.3d 438, 442
(2d Cir. 1995); Gannon, 2007 WL 2844869, at *7.  "Under this
highly deferential standard of review, this Court cannot
substitute its judgment for that of the Plan Administrator and
will not overturn a decision to deny or terminate benefits
unless it was without reason, unsupported by substantial
evidence or erroneous as a matter of law."  Fuller v. J.P.
Morgan Chase & Co., 423 F.3d 104, 107 (2d Cir. 2005) (internal
quotation marks omitted); see also Pagan 52 F.3d at 442
(internal quotation marks omitted); Petri v. Sheet Metal

Workers' Nat'l Pension Fund, No. 07 Civ. 6142, 2009 WL 3075868,
at *5 (S.D.N.Y. Sept. 28, 2009).  Substantial evidence is "such
evidence that a reasonable mind might accept as adequate to
support the conclusion reached by the [decisionmaker and] . . .
requires more than a scintilla but less than a preponderance."
Miller v. United Welfare Fund, 72 F.3d 1066, 1072 (2d Cir. 1995)
(quoting Sandoval v. Aetna Life & Cas. Ins. Co., 967 F.2d 377,
382 (10th Cir. 1992)).

     "The arbitrary and capricious standard of review is highly
deferential to a plan administrator.  The question before a
reviewing court under this standard is 'whether the decision was
based on a consideration of the relevant factors and whether
there has been a clear error of judgment.'"  Jordan v. Ret.
Comm. of Rensselaer Polytechnic Inst., 46 F.3d 1264, 1271 (2d
Cir. 1995) (quoting Bowman Transp., Inc. v. Arkansas Best
Freight Sys., Inc., 419 U.S. 281, 285 (1974)) (internal
quotation marks omitted); Gannon, 2007 WL 2844869, at *10.
Arbitrary and capricious review in an ERISA case in the district
court is limited to the administrative record.  See Miller, 72
F.3d at 1071; Gannon, 2007 WL 2844869, at *10.

     There is no dispute that Seaman's insurance policy contains
explicit language granting First Unum the discretion to
determine policy benefits.  Summary judgment, therefore, is an
appropriate means for this Court to review the administrative

record to determine whether, based on that record, First Unum's determiniation was arbitrary and capricious.  See Mohamed v. Sanofi-Aventis Pharms., No. 06 Civ. 1504, 2009 WL 4975260, at *9 (S.D.N.Y. Dec. 22, 2009) ("[T]he district court sits in effect as an appellate court to determine whether the denial of ERISA benefits was arbitrary and capricious." (internal citation omitted)); see also Gannon, 2007 WL 2844869, at *6-7, 10.

The United States Supreme Court recently reiterated that when the administrator has a conflict of interest, that conflict is a factor that should be weighed by the reviewing court in determining whether the administrator abused its discretion in denying benefits.  See Metro. Life Ins. Co. v. Glenn, 128 S. Ct. 2343, 2348 (2008) (citing Firestone, 489 U.S. at 115).  The circumstances of the particular case determine the weight accorded to the conflict of interest.  See Glenn, 128 S. Ct. at 2351 ("The conflict of interest at issue here, for example, should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claim administration.").[2]  When an administrator both evaluates and

_____

[2] Prior to the United States Supreme Court's decision in Glenn, the Court of Appeals for the Second Circuit established an exception to the arbitrary and capricious standard of review when the plan administrator is shown to have a conflict of interest.  See Sullivan v. LTV Aerospace & Def. Co., 82 F.3d 1251, 1255-56 (2d Cir. 1996).  Under the old exception, a de novo standard of

pays benefits claims, the court "must take [the conflict] into account and weigh [it] as a factor in determining whether there was an abuse of discretion, but [the conflict] does not make de novo review appropriate." McCauley, 551 F.3d at 133 (citing Glenn, 128 S. Ct. at 2348); see also Hobson v. Metro. Life Ins. Co., 574 F.3d 75, 82-83 (2d Cir. 2009). Whether the "conflict of interest affected the choice of a reasonable interpretation" is just "one of several different considerations" for the reviewing court. Hobson, 574 F.3d at 83 (internal quotation marks omitted) (quoting McCauley, 551 F.3d at 133); see also Petri, 2009 WL 3075868, at *6. It is clear, and both parties acknowledge, that First Unum has a conflict as the administrator and payor under the policy. Therefore, the Court must take this conflict of interest into account in weighing the evidence under the arbitrary and capricious standard.

**B.**

Seaman argues for the first time in her reply brief that the burden of proof is really on First Unum to show that the

---

review was appropriate when the conflict was shown to affect the reasonableness of the plan administrator's decision. See id. However, the Court of Appeals for the Second Circuit has abandoned this exception in light of Glenn. See Glenn, 128 S. Ct. at 2350 (Firestone does not imply a "change in the standard of review, say, from deferential to de novo review.") (emphasis in original); McCauley, 551 F.3d at 128. Now, in this Circuit a conflict of interest is merely to be weighed as a factor in the abuse of discretion analysis. See McCauley, 551 F.3d at 128 (citing Glenn, 128 S. Ct. at 2348).

cause of the disability was mental illness, because this is an
exclusion rather than a limitation.  An exclusion is a "clause
that excludes a particular condition or occurrence from the
coverage provided by the policy."  Critchlow v. First Unum Life
Ins. Co. of Am., 378 F.3d 246, 256 (2d Cir. 2004).

Under insurance law, "the insured has the burden of proving
that a benefit is covered, while the insurer has the burden of
proving that an exclusion applies."  Id. (quotation omitted).
Under ERISA, an exclusion is an "affirmative defense" requiring
that "an insurer bears the burden to prove facts supporting an
exclusion of coverage."  Id. at 257 (quotation omitted).

On the other hand, the issue of whether it is the insurer
or the insured who bears the burden of proving that a limitation
does or does not apply remains unsettled.  See Porco v.
Lexington Ins. Co., No. 08 Civ. 6951, 2009 WL 5171735, at *3 n.1
(S.D.N.Y. Dec. 30, 2009).  In Sheehan the district court held
that the plaintiff was not entitled to recover insurance
benefits because of a policy limitation for disability that "in
any way results from, or is caused or contributed to by a mental
or nervous disorder."  Sheehan v. Metro. Life Ins. Co., 368 F.
Supp. 2d 228, 234 & 264-65 (S.D.N.Y. 2005) (claimant entitled to
recover until claimant's surgical procedure when claimant met
burden of proving disability up to limitations period, but had
not proved that mental limitation did not apply after the

surgery).  The district court made its determination when the
plaintiff failed to prove that the plaintiff's physical cardiac
condition was totally disabling after the plaintiff's cardiac
surgery.  See id. at 264-65.  Therefore, the district court
placed the burden of proving that a limitation does not apply on
the insurance claimant.

At oral argument, Seaman's counsel argued that the policy's
mental illness limitation is essentially a time-delayed
exclusion.  After 24 months of benefits, a disability due to a
mental illness is excluded from coverage.  However, the policy's
mental illness provision does not "exclude[] a particular
condition or occurrence from the coverage provided by the
policy."  Critchlow, 378 F.3d at 256.  Seaman's disability is
not a condition that is excluded from coverage, as evidenced by
the fact that First Unum did pay 24 months of benefits and
readily acknowledges that those payments were proper.  Cf.
Zurich Am. Ins. Co. v. ABM Indus., 397 F.3d 158, 172 (2d Cir.
2005) (insurance claimant bears burden of proof with regard to
"per-occurrence limitations," which "define the scope of
coverage and are not policy exclusions").

Instead, the provision is more like the limitation in
Sheehan.  See Sheehan, 368 F. Supp. 2d at 234-35.  In Sheehan,
the court found that the claimant had proved disability and was
entitled to benefits up until the limitation, but found that the

claimant was not entitled to benefits past the limitation period when the claimant had failed to prove that the disability was not mental in nature past the limitations period.  See Sheehan, 368 F. Supp. 2d at 264-65.

Moreover, it is reasonable to place the burden of proof regarding the mental illness provision on Seaman.  The policy itself requires the claimant to prove disability.  Seaman has easier access to her own medical records than First Unum has because she is in a better position to know which doctors she has visited and where they are located.  See, e.g., Green Tree Fin. Corp.-Alabama v. Randolph, 531 U.S. 79, 96 (2000) (Ginsburg, J., concurring in part and dissenting in part) (party's access to evidence is "compelling rationale[]" for allocating burden of proof).  It would not be reasonable for Seaman to fail to provide the MRI films and the records of her 1998 hospitalization—which would both be significant evidence regarding the cause of Seaman's disability—and then to claim that First Unum had failed to meet its burden to show that the cause of her disability was a mental illness.[3]

---

[3] At oral argument Seaman's attorney argued that Dr. Neuren should be faulted for criticizing the determination of Dr. Lennox when Dr. Neuren had not himself seen the MRI films.  However, it is not unreasonable for Dr. Neuren to discount Dr. Lennox's finding of "probable mild atrophy" when this finding is not a finding of serious brain injury, when Seaman was subsequently able to obtain sensitive employment, and the objective evidence provided to First Unum did not support a conclusion of physical brain injury.

Therefore, the plaintiff had the burden of establishing that her disability was not based on a mental illness and the Court reviews First Unum's determination of that issue on the basis of whether that determination was arbitrary or capricious, taking into account First Unum's conflict of interest.  However, this issue of the burden of proof is not dispositive.  Both parties agreed at oral argument that the burden of proof will only make a difference in this case if the evidence is in equipoise.  The evidence in the record is not in equipoise. First Unum's determination that the objective evidence supports a finding that Seaman's disability has a mental cause was not arbitrary and capricious.

## C.

Neither party disputes that the plaintiff was disabled under the policy for two years prior to August 2004.  The issue is whether First Unum was arbitrary and capricious in determining that the plaintiff's disability is "due to mental illness," weighing First Unum's conflict of interest as a factor in the arbitrary and capricious analysis.  The evidence in this case strongly supports First Unum's finding that the plaintiff's disability is due to mental illness.

In the appeal denial letter dated April 22, 2005, First Unum found that Seaman's file "did not substantiate a condition severe enough to cause her to be disabled from her regular occupation due to a physical condition." (R. at 1127.)  The letter noted that "benefits for a disability due to a mental illness are limited to 24 months." (R. at 1126.)  In making its determination, First Unum relied heavily on the review of Seaman's medical records conducted by Dr. Neuren, who found that there are "large numbers of inconsistencies and . . . serious concerns about the extent of [Seaman's] problems . . . ." (R. at 1127.)

First Unum first noted that the records provided to them contained no records from April 17, 1998, the date of Seaman's head injury. (R. at 1127.)  The record does contain a letter dated April 21, 1998 from Dr. Martin, who evaluated Seaman shortly after the injury.  First Unum's denial letter notes that "the CAT scan [taken at the hospital at the time of Seaman's injury] was normal." (R. at 1127.)  Dr. Martin's letter does state that a CT scan taken at the hospital was "apparently negative," although Dr. Martin also noted that Seaman suffered from cerebral concussion, headaches, nausea, numbness, and other symptoms following her 1998 accident. (R. at 973-75.)  Some of these symptoms continued in follow-up visits, but in November 1999 Dr. Martin noted that Seaman believed her cognitive and

27

memory functions had returned to near normal.  (R. at 980.)  Dr.
Prince also noted that Seaman's CT scans were not abnormal.  (R.
at 447.)

First Unum's denial also relied in part on the reports of
those doctors who have seen the plaintiff's MRI films.  (R. at
1127.)  First Unum noted that, after reviewing the MRI films,
Dr. Lennox found "probable mild atrophy" and neurosurgeon Dr.
Kirkpatrick found that the studies were normal.  (R. at 1127.)
Psychologist Dr. Markewich noted that the plaintiff did not
remember her head injury and that the plaintiff's MRI scans were
normal and initiated efforts to obtain neuropsychological
testing for Seaman.  (R. at 32, 408.)[4]  First Unum did not
comment on Dr. Lennox's findings in its final determination, but
Dr. Neuren did criticize Dr. Lennox's statement that the MRI's
showed "probable mild atrophy" as being "patently vague."  It
was not arbitrary and capricious for First Unum to weigh most
heavily the findings of two doctors that the MRIs were normal
against Dr. Lennox's determination that the MRIs showed
"probable mild atrophy" when Dr. Neuren also cast doubt on the
weight of Dr. Lennox's findings.

_____

[4] First Unum's letter also refers to neurologist Dr. Martin's finding that the
MRIs were normal, but this was an apparent error.  There is no evidence that
Dr. Martin viewed or commented on the MRI films.  Rather, Dr. Martin's report
indicates that the CT scans taken in 1998, after the accident, were
"apparently negative studies."  (R. at 973 & 1127.)  The First Unum report
does note that the plaintiff was seen by Dr. Martin and that the "CAT scan
was normal."  (R. at 1127.)

First Unum was unable to evaluate the plaintiff's 1998 hospital records, and instead relied on the statement of the plaintiff's own doctor, Dr. Martin, that the CT scans were normal.  First Unum's doctors were likewise unable to examine the plaintiff's MRI films for themselves because the plaintiff did not provide them.  The plaintiff argues that First Unum's determination was arbitrary and capricious in part because First Unum's doctors did not themselves review her 1998 hospital records or her MRI films, and the plaintiff argues that Dr. Neuren should not criticize Dr. Lennox's findings when Dr. Neuren has not himself reviewed the MRI films.  However, it is difficult for Seaman to rely on a comparison of the MRIs and her 1998 hospital records when she claims that the MRI films were sent to the NHS in England, and the hospital records are with the Social Security Administration, and that she is unable to obtain them.  Seaman responds that First Unum did not specifically ask for the MRI films or hospital records until the administrative appeal—but Seaman did not get them even then and provide them to First Unum.  Moreover, First Unum had made clear to the plaintiff before it denied benefits that it sought any evidence of an impairing physical condition.

Dr. Wentland, a neuropsychologist First Unum consulted during its initial review of Seaman's claim, found that "[w]hile there is no evidence of any systemic physical illness in the

record, we cannot rule out physical damage to brain." Dr.
Wentland noted that there is "no evidence of a physically-
impairing condition" in part because Dr. Wentland could not find
any indication in the record that an MRI had been performed.
(R. at 1249.) Without access to the MRI films, it was
reasonable for First Unum to conclude that it lacked evidence of
a physical cause of Seaman's disability. And Seaman knew the
importance of providing the information because First Unum told
her before finally denying her claim, and before appeal, that it
needed objective evidence. Indeed, First Unum notified Seaman
that it believed the mental illness limitation might apply in
its initial letter granting her disability benefits. In that
letter, First Unum indicated that it would continue to
investigate and requested that Seaman obtain medical records
from various doctors. Even if First Unum did not specifically
mention the MRI films or 1998 hospital records in that letter,
Seaman was on notice that she would need to provide objective
evidence of her physical disability. In any event, First Unum
cannot be faulted because its doctors, such as Dr. Neuren, did
not have the 1998 hospital records or MRI films to review. It
was not arbitrary and capricious for First Unum to rely on Dr.
Martin's report that the CT scan from the plaintiff's 1998
hospitalization was normal.

First Unum also cited Dr. Neuron's finding that
"[p]rogressive impairment occurring years after the indexed
event is not credible" because "head injuries . . . are maximal
the day after the event, after which there is subsequent
improvement . . . ." (R. at 1127.)  Dr. Neuren also found that
it was not credible that Seaman could have obtained her position
at MSKCC and later have to cease that work due to a brain injury
sustained years before her employment commenced.  (R. at 1127.)
The plaintiff disputes the studies that Dr. Neuren relied on in
determining that brain injuries do not become progressively
worse over time, but Dr. Neuren's findings are consistent with
the plaintiff's work history.  Even if the plaintiff's head
injury is capable of becoming progressively worse, she began her
position at MSKCC more than three years after her 1998 injury.
The plaintiff and her attorney have said that the plaintiff's
work as a radiation therapist involved "critical work" with
"life-threatening consequences should a mistake occur." (R. at
941.)  It is reasonable to conclude that the plaintiff would not
have been hired in such a sensitive position if she were showing
any signs of disability due to a physical condition in 2001.
Even if the plaintiff's head injury is capable of becoming
progressively worse, it was not arbitrary and capricious for
First Unum, relying on Dr. Neuren, to refer to Seaman's apparent
lack of symptoms that otherwise would have been apparent to her

employer in 2001 as substantial evidence that her current disability is due to a mental illness, rather than from a physical injury whose onset was three years before.

First Unum also relies on its allegation that Seaman's activities have been "inconsistent with cognitive impairment and inconsistently reported," referring to Seaman's employment search and various fertility treatments where Seaman failed to mention any of her cognitive impairments.  (R. at 1127.)  These allegations do not lend substantial support for First Unum's final determination.  Patients can reasonably be expected to report different symptoms to a doctor treating a head injury or a mental illness rather than to a doctor dealing with fertility issues.  What a patient reports to a fertility specialist is not strong evidence of what was causing any mental problems.  Nor is the desire for employment conclusive that a patient is not impaired because of a brain injury.

First Unum further noted that there were indications of poor effort by the plaintiff during neurological testing.  (R. at 724 & 1127-28.)

There is additional evidence in the record that is not directly cited in First Unum's denial letter but is nevertheless relevant here.  Dr. Kirkpatrick reported in July 2002 that a skull x-ray of Seaman taken shortly after her accident "showed no injuries" but the plaintiff "has clearly suffered a

significant head injury" with symptoms including post-
concussional syndrome, headaches, dizziness, poor concentration
and memory, reduced left/right discrimination, poor
coordination, panic attacks, and difficulties with social
interactions that were "[l]ikely to be permanent." (R. at 500,
502.) Dr. Leidal, the clinical psychologist and
neuropsychologist retained by the Social Security Administration
noted in January 2003 that while Seaman is of above average
intelligence, she suffers from poor memory, cerebral
dysfunction, and neuropsychological dysfunction. (R. at 482-
85.)

Seaman also argues for the first time in her reply brief
that Dr. Neuren should be faulted because he did not respond to
the observations of Dr. Politzer, who noted visual difficulties
which could support a finding of brain injury. Dr. Politzer
wrote that Seaman's "visual perceptual abilities are below
expected in visualization as well as in speed and span of
perception" and that her "[v]isual field shows some scattered
losses." (R. at 965.) Seaman did not raise this issue in any
prior papers and it should not be raised for the first time in
reply, when First Unum had no opportunity to respond. Moreover,
the fact that the plaintiff raised the issue for the first time
in her reply undercuts the significance of the evidence. In any
event, even if the plaintiff had properly raised this argument

earlier, the evidence from Dr. Politzer would not support a
finding that First Unum had acted arbitrarily or capriciously in
its determination of the plaintiff's claim.  First, the Court is
mindful that Dr. Neuren's report, on which First Unum relied,
addresses a voluminous medical history.  Dr. Henrickson, who
First Unum consulted during the administrative appeal, did note
that both Dr. Politzer and Dr. Wack had found visual impairment.
(R. at 1095.)  Dr. Wack found that Seaman had a "very, very
slowed rate of cognitive processing," "significant impairments
in visual perception and processing visual information," and
that the plaintiff "lacks the functional memory capacity that
her intellectual ability should allow for."  (R. at 696-701.)
Dr. Henrickson, a neuropsychologist, recommended that these
findings be reviewed by a physician.  (R. at 1095.) While Dr.
Neuren did not subsequently address Dr. Politzer's findings with
regard to Seaman's vision, Dr. Neuren's report did include Dr.
Martin's notation that Seaman was suffering from "visual
problems." (R. at 1105.)  The plaintiff's visual difficulties
were therefore part of the evidence considered by First Unum in
the context of the plaintiff's entire medical record.  Moreover,
Dr. Neuren did consider Dr. Wack's testing of the plaintiff and
found that Dr. Wack's results regarding IQ contained
"inconsistencies" between Seaman's performance on the test and
her "overall level of functioning."  (R. at 1109.)  Dr. Neuren

therefore did not ignore Dr. Wack's findings, but rather examined Dr. Wack's report and had reasons for discounting its value.

Finally,[5] First Unum noted that the plaintiff's medical records include "references to problems with anxiety, depression, and panic attacks" that were treated up until February 2002.  (R. at 1128.)  Indeed, the record reflects that Dr. Markewich found Seaman suffered from "major depression," "panic disorder with agoraphobia," "personality change due to medical condition," and "obsessive compulsive disorder."  (R. at 24.)  Dr. Zimmerman, a clinical neuropsychologist and licensed psychologist who reviewed the records of Drs. Leidal, Wack, and Markewich for First Unum during its initial claim determiniation found "identified inconsistencies in the testing that suggest the involvement of nonneurological factors such as effort and psychological factors" and "substantial evidence of serious psychological disturbance that is impairing."  (R. at 724.)  Moreover, Dr. Zimmerman found that "[t]his pattern of findings is not consistent with expectation with mild traumatic brain injury or any other neurological etiology."  (R. at 724.)

During Seaman's administrative appeal the plaintiff provided First Unum with a letter from Dr. Wack noting a "clear

[5] First Unum's denial letter also addresses Seaman's claim that she was disabled by carpal tunnel syndrome.  Because Seaman has not pursued that issue on her appeal in this Court, it is unnecessary to examine First Unum's determination with regard to carpal tunnel syndrome.

absence of psychological symptoms, and the equally clear
presence of evidence of traumatic brain injury." (R. at 955-
56.) Dr. Wack argued that Seaman's depression and anxiety are
"a common component of recovery from head injury and do not
negate the fact that a brain injury occurred" and that is it not
surprising that Seaman would experience anxiety and depression
when she lost her ability to perform her job. (R. at 957-60.)
In the face of conflicting medical opinions regarding the
relationship between Seaman's diagnosed mental illnesses and
Seaman's disability, where First Unum lacked objective evidence
supporting a non-mental cause of her disability, it was not
unreasonable for First Unum to conclude that the cause of the
disability was a mental illness.

The Court is mindful that the relationship between First
Unum and Dr. Neuren has been viewed skeptically by some courts,
and that other courts including the Court of Appeals for the
Second Circuit have criticized First Unum's claim determinations
in the past in individual cases. See McCauley, 551 F.3d at 137
(criticizing First Unum); White, 2005 WL 168735, at *13-14
(criticizing Dr. Neuren's relationship with First Unum).
However, these doubts are not enough to tip the balance of
factors in favor of Seaman in this case.

While neither party disputes that Seaman suffers from a
disability of some sort, it was not arbitrary or capricious for

First Unum to determine that the weight of the evidence supported its view that Seaman's disability is due to mental illness.  The plaintiff attempted to establish that her disability was caused by an accident that had happened over four years before, despite her ability to obtain a sensitive medical position in the interim.  As noted above, First Unum cannot be faulted for failing to examine the plaintiff's 1998 hospitalization records and MRI films which the plaintiff never produced.  First Unum, through Dr. Neuren, did examine what Seaman's own doctors, who have no affiliation with First Unum, have said about the CT and MRI scans.  The weight of the evidence on the record before First Unum did not support a determination that Seaman's disability is due to a physical cause.  The plaintiff has been diagnosed with various mental illnesses.  When Seaman did not provide her MRI films or 1998 hospitalization records, and her doctors indicate that her CT scan was normal, it was not unreasonable for First Unum to conclude that it lacked evidence supporting a physical cause of Seaman's disability and that the disability was due to a mental illness.  Even taking the conflict of interest into account, this Court cannot find that under these facts First Unum's determination that the plaintiff's disability is due to a mental illness is arbitrary and capricious.

## CONCLUSION

For these reasons, First Unum's motion for summary judgment

is **granted**.   Seaman's motion for summary judgment is **denied**.

The Clerk is directed to enter judgment dismissing the complaint

and closing this case.

The Clerk is directed to close Docket Nos. 24 and 27.

**SO ORDERED.**

Dated:    New York, New York
          March 8, 2010

John G. Koeltl
United States District Judge